### In re COUNTY OF ORANGE, a political subdivision of the State of California;

### Orange County Investment Pools, an instrumentality of the County of Orange, Debtors.

### Bankruptcy Nos. SA 94–22272 JR, SA 94–22273 JR.

### United States Bankruptcy Court, C.D. California.

### May 22, 1995.

---

Bruce Bennett and Lee Bogdanoff of Stutman, Treister & Glatt, Los Angeles, CA, for debtors.

Patrick C. Shea, Pillsbury, Madison & Sutro, San Diego, CA, for Official Committee of Pool Participants.

Ronald L. Olson, Munger, Tolles & Olson, Los Angeles, CA, for Merrill Lynch.

Dennis M. Hauser, Hauser & Mouzes, Woodbridge, CA, for special risk management.

Ronald Rus, Rus, Miliband, Williams & Smith, Irvine, CA, for Yorba Linda Water Dist.

John Poppin, Poppin & Shier, San Francisco, CA, for City of Huntington Beach.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

Under California state law, certain government entities may choose to deposit, or are required to deposit, their excess funds into the county treasury. The county treasurer may then invest these funds in a variety of securities. Acting pursuant to these statutes, the Orange County Treasurer, Robert L. Citron (the "Treasurer"), combined the funds he received from various participating entities into a commingled investment pool, a commingled bond investment pool, and a specific investment account (collectively, the "OCIP"). By December 1994, 190 municipal entities had invested approximately $7.6 billion in the OCIP.

The Treasurer's investment strategy for the OCIP was risky, volatile and lacked liquidity. It revolved around the Treasurer's bet that interest rates would not rise in 1994. This proved incorrect and on December 6, 1994, Orange County (the "County") and the OCIP filed separate chapter 9 petitions in bankruptcy.

Later, three OCIP participants, Yorba Linda Water District ("Yorba Linda"), Special District Risk Management Authority ("SDRMA"), and Huntington Beach ("Huntington Beach") and Merrill Lynch & Co., Inc. ("Merrill Lynch") (collectively, the "Movants") filed motions to dismiss the OCIP case (the "Motions"). Movants contend that the

OCIP case should be dismissed because the OCIP has not satisfied the jurisdictional requirements for a chapter 9 debtor.

After a hearing on March 28, 1995, I took the dismissal question under submission.

## JURISDICTION

This court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(a) (1995) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (1995) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O) (1995).

## STATEMENT OF FACTS

The Treasurer is a separately elected officer of the County. Cal. Gov't Code §§ 24000(f) and 24009. He is responsible for receiving and safekeeping all monies belonging to the County and all other funds directed by law to be paid to the Treasurer. Cal. Gov't Code § 27000.

California state law requires that all excess funds of certain governmental entities be held by the Treasurer. *E.g.*, Cal.Educ.Code § 41001 (all monies received by school districts); Cal.Bus. & Prof.Code § 6320 (all monies received by law libraries). Other public entities, such as cities and special districts, may also deposit their excess funds into the County treasury if authorized by their governing boards. *E.g.*, Cal.Gov't Code § 6505.5 (funds of entities created by joint powers authorities); Cal.Pub.Util.Code § 40096 (funds of the Orange County Transit District). These deposits may then be accepted by the Treasurer for investment.[1] Once these funds are deposited into the County treasury, the Treasurer may invest[2] in a variety of securities, including U.S. Treasury Notes, bonds and reverse repurchase agreements ("reverse repos"). Cal.Gov't Code §§ 53601 and 53635. On February 2, 1988, the County Board of Supervisors (the "Board") adopted Resolution No. 88–134 which authorized local agencies to deposit their excess funds in the County treasury (the "Resolution"). By December 1994, 190 municipal entities had invested approximately $7.6 billion in the OCIP. California Bureau of State Audits, *Report on Orange County Treasurer's Investment Strategy*, at 3 (March 1995).

The Treasurer combined the funds he received from these entities into the OCIP.[3] *Id.* at 2. This pooling arrangement allowed for the purchase of large denominations of securities that provided higher yields than those available to smaller investors. *Id.*

The Treasurer's investment strategy for the OCIP "was risky, volatile and lacked liquidity." *Id.* at 9. This strategy involved leveraging or borrowing billions of dollars against the OCIP to obtain cash for invest-

---

1. Cal.Gov't Code § 53684(a) provides:
 Unless otherwise provided by law, if the treasurer of any local agency, or other official responsible for the funds of the local agency, determines that the local agency has excess funds which are not required for immediate use, the treasurer or other official may, upon the adoption of a resolution by the legislative or governing body of the local agency authorizing the investment of funds pursuant to this section and with the consent of the county treasurer, deposit the excess funds in the county treasury for the purpose of investment by the county treasurer pursuant to Section 53601 or 53635.

2. The Treasurer's authority to invest on behalf of the County is derived from Cal.Gov't Code § 53607 that states:

 The authority of the legislative body to invest or to reinvest funds of a local agency, or to sell or exchange securities so purchased, may be delegated by the legislative body to the treasurer of the local agency, who shall thereafter assume full responsibility for such transactions until such time as the delegation of authority is revoked, and shall make a monthly report of such transaction to the legislative body.
 On August 20, 1985, the County delegated its investment authority pursuant to Resolution No. 85–1221.

3. The OCIP cites no California statute that authorizes the Treasurer to commingle funds of its participants. The evidence indicates, however, that the OCIP participants knew of this practice.

ments,[4] thereby dramatically increasing the OCIP's risk to interest rate changes. *Id.* at 13. For example, as of November 30, 1994, the County's leveraging strategy magnified the impact of an interest rate change on the base portfolio 2.7 times. *Id.*

Using the funds obtained through leveraging, the Treasurer often purchased derivatives known as inverse floaters.[5] *Id.* at 19. Inverse floaters are highly sensitive to changes in interest rates. The OCIP held at least $6.6 billion of these derivatives (32% of the total portfolio). *Id.* By investing heavily in inverse floaters, the Treasurer bet that interest rates would remain low or fall. *Id.*

The Treasurer's strategy was also risky because he purchased long-term securities with short-term borrowings. *Id.* at 20. This strategy forced the OCIP to continually borrow at current short-term rates until the long-term security matured.[6] *Id.* at 21. Thus, as short-term rates rose, the spread decreased and eventually disappeared. *Id.* at 22.

The practice of borrowing short and buying long further exposed the OCIP to an increased risk of collateral calls. *Id.* at 22. "When a broker lends money under a reverse repo, the broker requires collateral in excess of the amount lent to protect its inter-

est." *Id.* If the market value of the collateral declines, the broker can send a collateral call to the borrower requiring additional assets to secure the borrower's interest. *Id.* Collateral calls adversely affect a securities portfolio by draining cash, requiring the deposit of additional collateral or forcing the premature liquidation of the collateral. *Id.*

As stated, the Treasurer's investment strategy revolved around his prediction that interest rates would not rise. *Id.* at 3. By early 1994, however, interest rates began rising sharply. As interest rates rose, the value of the collateral pledged to secure the OCIP's reverse repos dropped. *Id.* This created two problems. First, the market value of the OCIP portfolio plummeted. *Id.* Second, lenders began making collateral calls that the OCIP could not meet. Further, these lenders refused to renegotiate or renew existing reverse repos. On December 6, 1994, faced with the prospect of the liquidation of the OCIP portfolio by lenders, the County and the OCIP filed chapter 9 petitions in bankruptcy.

In response, Yorba Linda, SDRMA and Merrill Lynch[7] filed the Motions. Later, Huntington Beach joined the moving parties. Movants contend that the OCIP case should be dismissed because: (1) the OCIP is not an

---

4. The OCIP was leveraged through the use of reverse repos. *Id.* at 10. In a reverse repo, the County "borrows" by selling a security to an investment broker with an agreement to repurchase it a short time later. *Id.* The County then receives short-term cash from the broker and agrees to pay a stipulated interest rate for the use of that money. *Id.* The County then purchases other securities with the cash, thereby "leveraging" the original principal. *Id.* at 11. If the cost of the borrowing (i.e. the interest rate charged by the investment broker) is less than the earnings on the investment, the reverse repo transaction is profitable to the County. *Id.* This difference is known as the "spread." *Id.* at 13.

The Treasurer used reverse repos as a primary means to increase the OCIP's yield and leveraged the OCIP's assets several times over. *Id.* at 11.

5. Derivatives are financial instruments whose value is based on a reference rate or index such as the London Interbank Offer Rate (LIBOR). *Id.* at 18. Because of the volatility of these securities, they introduced substantial risk into the portfolio. *Id.* The predominant type of derivative that the County purchased was an inverse floating rate note. *Id.* at 19. The interest rate on inverse floaters moves in the opposite

direction from the underlying index. *Id.* Thus, if the LIBOR increases, the note's yield drops. *Id.*

6. Unmatched maturity dates create risk for a securities portfolio because reverse repo borrowing rates are guaranteed only for short time periods (e.g., 180 days or less) while the rate for a typical security is much longer (e.g. two to four years). *Id.* at 22. This creates a situation where the investor must continually borrow at current short-term rates until the security matures. *Id.* If short-term interest rates rise sufficiently this will reduce, or even eliminate, the spread. *Id.*

The conservative approach to borrowing with reverse repos is to "match the maturity date of the asset purchased with the due date of the reverse repo." *Id.* at 21. This approach ensures that the cost of borrowing is fixed, thereby guaranteeing a positive spread.

7. Merrill Lynch has no funds in the OCIP. Instead, Merrill Lynch was the OCIP's investment advisor prior to the OCIP's filing and is now a defendant in an adversary proceeding brought by the OCIP and the County.

entity; (2) the OCIP is not a municipality; (3) the OCIP has not been specifically authorized by the State of California to file chapter 9; (4) the OCIP is not insolvent because it has no debtor/creditor relationship with the OCIP participants; (5) the OCIP did not negotiate in advance with its creditors; and (6) the petition was not filed in good faith because the OCIP is a legal fiction created for the sole purpose of filing bankruptcy.

The County argues that the OCIP case should not be dismissed because the OCIP is eligible for chapter 9 relief and the case was filed in good faith.

At a hearing on March 28, 1995, I took the matter under submission to determine whether to dismiss the OCIP case.

### DISCUSSION

■ Pursuant to § 921(c) of the Bankruptcy Code[8] (the "Code"), the court may dismiss a chapter 9 petition "if the debtor did not file the petition in good faith or if the petition does not meet the requirements of [§ 109(c)]." Although the language of § 921(c) is permissive, the case law indicates that § 921(c) "must be given a mandatory effect if the defect in the filing is in the debtor's eligibility to file Chapter 9." 4 *Collier on Bankruptcy* ¶ 921.04 at 921–7 (L. King. 15th ed. 1994); *see also In re Sullivan County Regional Refuse Disposal Dist.*, 165 B.R. 60, 83 (Bankr.D.N.H.1994) ("The debtors in the present case have failed to establish the requisites for Chapter 9 relief ... under § 109(c) ... and therefore their petitions must be dismissed...."). The burden of proving eligibility under § 109(c) is on the party filing the petition. *In re City of Bridgeport*, 129 B.R. 332, 339 (Bankr. D.Conn.1991).

### The OCIP is an entity.

■ Pursuant to § 109(c), a debtor must be an "entity" before it is eligible to file chapter 9.[9] Merrill Lynch contends that the OCIP is not an entity, but rather a legal fiction created on the eve of the filing for the sole purpose of filing chapter 9.

In response, the OCIP contends that it existed long before the petition date and was treated as a separate entity by Merrill Lynch and other entities, including over 200 investor participants. The OCIP points out that it was formed pursuant to a group of statutory provisions (*e.g.*, Cal. Gov't Code §§ 53684, 53601 and 53635) that authorize the Treasurer to receive and invest the excess funds of various agencies. Acting in accordance with these statutory provisions and the Resolution, the Treasurer set up and managed the OCIP. At the time of the filing, the OCIP had outstanding accounts for 190 participants aggregating approximately $7.6 billion. These funds were invested and managed by the Treasurer for the benefit of participants. Moreover, several financial institutions, including Bank of America, First Interstate Bank of California and Dai–Ichi Kango Bank of California, had entered into contracts to invest funds in the OCIP prior to the petition date. Even Merrill Lynch has admitted the separate existence of the OCIP in this case.[10]

Under Code § 101(15), an "entity" includes a "person, estate, trust, governmental unit, and United States Trustee...." It is the

---

**8.** The Code is set forth in 11 U.S.C. §§ 101–1330 (1995).

**9.** Section 109 states in relevant part:

(c) An entity may be a debtor under chapter 9 of this title if and only if such entity—
 (1) is a municipality;
 (2) is specifically authorized, in its capacity as a municipality or by name to be debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
 (3) is insolvent;
 (4) desires to effect a plan to adjust such debts; and

(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
 (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
 (C) is unable to negotiate with creditors because such negotiation is impracticable....

**10.** Merrill Lynch did so as an underwriter in the Official Statement accompanying the *1994–95 Tax and Revenue Anticipation Notes, Series A.*

most inclusive of the various defined terms relating to bodies or units. H.R.Rep. No. 595, 95th Cong., 2nd Sess. 311 (1978) U.S.Code Cong. & Admin.News 1978, p. 5787, 6268. An entity is also defined as "a real being . . . an existence apart." *Black's Law Dictionary* 532 (6th ed.1990). "Being" is defined as "something that actually exists." *Webster's Ninth New Collegiate Dictionary* 141 (9th ed.1990).

Here, the OCIP did exist. It was comprised of three separate commingled funds— an investment pool, a bond investment pool and a specific investment account. California Bureau of State Audits, *supra*, at 2. The OCIP borrowed funds from various financial institutions, purchased securities and transferred securities as collateral for loans. Moreover, the OCIP liquidated its assets, distributed funds and provided accountings to its participants. These facts establish that the OCIP existed before the bankruptcy and was not a legal fiction created solely to file chapter 9.

The OCIP is also an entity because it is a governmental unit. Code § 101(27) defines a "governmental unit" as including an "instrumentality of . . . a municipality. . . ." Clearly, the County is a municipality under the Code.[11] The term "instrumentality" is defined as "something by which an end is achieved. . . ." *Black's Law Dictionary* 801 (6th ed.1990).

The Treasurer is an officer of the County who was directed under Cal. Gov't Code § 27000 to receive and invest funds. The Treasurer established the OCIP to maximize the investment return for participants and used it as the vehicle to carry out his statutory mandate. The County had oversight and control responsibilities over the OCIP through its supervisory control over the Treasurer.[12] Accordingly, the OCIP is an instrumentality of the County[13] which, in turn, makes it a governmental unit. Because by definition a governmental unit is an entity, the OCIP is an entity under the Code.

**The OCIP is not a municipality.**

■ Section 101(40) states that a municipality "means political subdivision or public agency or instrumentality of a State." Merrill Lynch argues that no enactment of the California legislature creates or establishes the OCIP as a political subdivision, public agency or instrumentality of the State of California. Moreover, the County does not have the inherent power to create the OCIP. Finally, the OCIP does not have the characteristics of a municipality.

The OCIP responds that the OCIP is the product of state statutes. Furthermore, as an instrumentality of the County, it is a "municipality" within the meaning of the Code.

■ The rules of statutory interpretation dictate that the court must first look to the language of the statute. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("where . . . the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917))). In *Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991), the Supreme Court held that "[w]here, as here, the resolution of a question of federal law

---

**11.** Code § 101(40) defines a municipality as a "political subdivision or public agency or instrumentality of a State." In *Ashton v. Cameron County Water Improvement District No. One*, 298 U.S. 513, 527, 56 S.Ct. 892, 894, 80 L.Ed. 1309 (1936), the Supreme Court held that the debtor was a political subdivision because it was created by the state for the local exercise of state sovereign powers such as the power to sue and be sued and levy and collect taxes.

In this case, the County was created by the State of California. *See* Cal.Gov't Code § 23130. The County has express sovereign powers such as the power to sue and be sued and levy and collect taxes. Cal.Gov't Code § 23004. Because the County is a political subdivision of the State of California, it is by definition a municipality.

**12.** Cal.Gov't Code § 25303 states: "The board of supervisors shall supervise the official conduct of all county officers . . . particularly insofar as the functions and duties of such county officers . . . relate to the assessing, collecting, safekeeping, management, or disbursement of public funds. . . ." Cal.Gov't Code § 24000(f) states that the treasurer is an officer of the County.

**13.** The OCIP's petition also states that it is an instrumentality of the County.

turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." Moreover, where the language of a statute is not ambiguous, legislative history need not be considered. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2297 n. 29, 57 L.Ed.2d 117 (1978).

The Code does not define the terms "political subdivision, public agency, or instrumentality of a State." The case law offers little guidance in this area.[14] Absent further definition, the boundaries of these terms are unclear, creating an inherent ambiguity as to what is and is not a municipality. The definition of a municipality in § 101(40) is, therefore, ambiguous.

Because the proper application of this statutory language is unclear, the legislative history of § 101(40) must be examined. The language of § 101(40) is nearly identical to the language in § 84 of the 1976 municipal bankruptcy legislation.[15] Section 84 generally categorized a list of entities contained in § 81 of the 1937 Bankruptcy Act (the "1937 Act").[16] The Code change was "intended to broaden the applicability of Chapter IX as much as possible." H.R.Rep. No. 686, 94th Cong., 2nd Sess. 20. (1975). Certainly, the term "municipality" should not be narrowly construed. This does not mean, however, that any entity under governmental control is a municipality. *See generally United States v. Turkette,* 452 U.S. 576, 581, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (statutes should be construed to avoid absurd results). The legislative history of § 101(40), although helpful, does not set the limits for inclusion in these broad categories of "political subdivision, public agency or instrumentality of a State."

14. There are no bankruptcy court decisions that define political subdivision, agency, or instrumentality.

15. Bankruptcy Act § 84, former 11 U.S.C. § 404 (1979); H.R.Rep. No. 686, 94th Cong., 1st Sess. 20 (1975). Section 404 provides: "Any State's political subdivision or public agency or instrumentality, which is generally authorized to file a petition under this chapter by the legislature ... is eligible for relief under this chapter...."

16. Section 81 of the 1937 Act, as finally amended in 1946, provides:

[C]ourts of bankruptcy shall exercise original jurisdiction as provided in this chapter for the composition of indebtedness of, or authorized by, any of the agencies or instrumentalities hereinafter named, payable (a) out of assessments or taxes, or both, levied against and constituting liens upon property in any of said agencies or instrumentalities, or (b) out of property acquired by foreclosure of any such assessments or taxes or both, or (c) out of income derived by such agencies or instrumentalities from any income-producing property, whether or not secured by a lien upon such property: (1) Drainage, drainage and levee, reclamation, water, irrigation, or other similar districts, commonly designated as agricultural improvements districts or local improvement districts, organized or created for the purpose of constructing, improving, maintaining, and operating such certain improvements or projects devoted chiefly to the operating of certain improvements of lands therein for agricultural purposes; or (2) local improvement districts, such as sewer, paving, sanitary, or other similar districts, organized or created for the pur-

poses designated by their respective names; or (3) local improvement districts, such as road, highway, or other similar districts, organized or created for the purpose of grading, paving, or otherwise improving public streets, roads, or highways; or (4) public-school districts or public school authorities organized or created for the purpose of constructing, maintaining, and operating public schools or public school facilities; or (5) local improvement districts, such as port, navigation, or other similar districts, organized or created for the purpose of constructing, improving, maintaining, and operating ports and port facilities; or (6) incorporated authorities, commissions, or similar public agencies organized for the purpose of constructing, maintaining, and operating revenue-producing enterprises; or (7) any county or parish or any city, town, village, borough, township, or other municipality....

Section 84 categorized (1)–(7) into three categories—political subdivisions, public agencies or instrumentalities of a state. It does not, however, specify which entities fall into each category. Clearly, the term "public agencies" was intended to replace the entities listed in (6). Further, it appears that the term "political subdivisions" was intended to replace (7) because each of the entities listed in (7) exercise sovereign powers of the state such as police power or the power to tax. *See Texas Learning Tech. Group v. Commissioner of Internal Revenue,* 958 F.2d 122, 124 (5th Cir.1992) ("The power to tax, the power of eminent domain, and the police power are the generally acknowledged sovereign powers."). This leaves "instrumentalities of a state" which, by default, must refer to the districts listed in (1)–(5).

Because neither the plain language of the statute nor its legislative history answers the question with sufficient clarity, the next step is to examine the bankruptcy practice that existed prior to the addition of § 101(40). The Supreme Court has indicated that it "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Pa. Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 563, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990) (citations omitted). Moreover, "when congress amends the bankruptcy laws, it does not write on a clean slate." *See Dewsnup v. Timm*, 502 U.S. 410, 419, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992). Accordingly, without a clear directive from Congress to the contrary, this court should follow prior bankruptcy law.

The first question is what is a "political subdivision." Section 81(7) defines political subdivision as "any county or parish or any city, town, village, borough, township, or other municipality...." [17] The common thread that ties these entities together is their ability to exercise various sovereign powers such as the power to tax, the power of eminent domain or the police power. *See supra*, n. 15.

Here, the OCIP has neither sovereign power delegated to it by the State of California, nor does it have by its existence some inherent sovereign power to act. Instead, the OCIP is the creation of the County and the Treasurer. It is an investment vehicle formed by the County and administered by the Treasurer to receive, commingle, invest, hold, account for and distribute funds of the participants who are authorized by state law to deposit their excess funds with the Treasurer. The OCIP does not possess the char-

acteristics of a sovereign, unlike the entities in § 81(7), nor is it similar in any other respect to the political subdivisions described therein. Accordingly, the OCIP is not a political subdivision.

Turning to the term "public agency," § 81(6) describes public agencies as "incorporated authorities, commissions, or similar public agencies organized for the purpose of constructing, maintaining and operating revenue producing enterprises...." Section 81(6) was added to the 1937 Act in 1946. The legislative history of this section indicates that the 1937 Act did not adequately address revenue bonds [18] "because they were not an important factor in municipal financing at the time." H.R.Rep. No. 2246, 79th Cong., 2d Sess. 2 (1946). By the 1940's, however, revenue bond financing became increasingly popular. *Id.* The development of this type of financing

> brought into existence a new type of municipality known as an authority. In some instances they are called commissions or districts, but essentially they are all of the same character that is, a public agency authorized to construct or acquire a revenue-producing utility and to issue bonds for such purpose payable solely out of the revenues derived from the utility.

*Id.*

Based on the foregoing, the OCIP is not a public agency as that term is used in § 81(6) because the OCIP was not organized for the purpose of maintaining or operating a revenue producing enterprise. Moreover, the OCIP does not finance its operations by issuing bonds of any type. Accordingly, I find that the OCIP is not a public agency within the meaning of § 101(40).[19]

---

**17.** Although this section says "other municipalities" the legislative history indicates that, at that time, "municipality" meant "political subdivision." 81 Cong.Rec. 6,318 (1937) ("subdivision 6 is grouped ... 'any city, town, village borough, township, or other municipality.... [T]hese specified political subdivisions of the State are not amenable to the bankruptcy powers under the Constitution.").

**18.** "These are bonds issued by a public agency which are not payable out of taxes but are payable solely from the revenues received from the operation of a revenue-producing public utility

or property [such as a toll bridge]." H.R.Rep. No. 2246, 79th Cong., 2d Sess. 2 (1946).

**19.** The OCIP argues that the courts have unanimously declared that an entity is a municipality if it is subject to control by public authority, state or municipal. *In re Westport Transit Dist.*, 165 B.R. 93, 95 (Bank.D.Conn.1994); *accord In re Greene County*, 59 B.R. 388, 389–90 (S.D.Miss. 1986) (a hospital is a "municipality" because the board of supervisors has the power to exert some control over the county hospitals). Applying the control analysis to this case, the OCIP contends

The last question is whether the OCIP is an "instrumentality of a State." Sections 81(1)–(5) describe several kinds of instrumentalities including various types of local improvement districts such as a public school district "organized or created for the purpose of constructing, maintaining, and operating public schools and public school facilities" or a port district "organized or created for the purpose of constructing, maintaining, and operating ports and port facilities." The characteristics and objectives of the OCIP have nothing in common with the characteristics and objectives of these several entities described in § 81. The OCIP is, therefore, not an instrumentality of the State of California.

The OCIP also argues that because it is an instrumentality of the County and the County is a political subdivision of the State of California, the OCIP is an instrumentality of the State and, therefore, a municipality.

This is incorrect for three reasons. First, Congress could easily have written § 101(40) to include instrumentalities of a County, public agency or political subdivision but it did not take that step.[20] Second, this leap in logic presents potential Constitutional problems because it would reduce state control over those entities entitled to file chapter 9. Lastly, interpreting § 101(40) this way would blur the boundaries surrounding the term "municipality" to the extent that any entity set up by a political subdivision or public agency could qualify for chapter 9. I am unwilling to accept this leap of faith without a

clearer indication that Congress intended this result.

Because the OCIP is not a political subdivision, public agency or instrumentality of the State of California within the meaning of § 101(40), the OCIP is not a municipality. **The OCIP was not specifically authorized to file chapter 9.**

■ The next requirement under § 109(c) is that the OCIP be specifically authorized to file chapter 9. Section 109(c)(2) states that an entity may be a debtor under chapter 9 if such entity "is specifically authorized, in its capacity as a municipality or by name ... to be a debtor under such chapter by State law...." Once again, the first step in statutory interpretation is to look at the language of the statute. I am unaware of any published case interpreting this language. Section 109(c)(2) is ambiguous regarding what is required for specific authorization and the degree of specificity. Accordingly, it is unclear from the statute how this requirement should be applied.

Turning to the legislative history of § 109(c)(2), prior to the Bankruptcy Reform Act of 1994 (the "1994 Act"), § 109(c) required that an entity be "generally authorized" to file bankruptcy.[21] The House Report to the 1994 Act indicates that the courts split whether this provision required express statutory authorization. H.R.Rep. No. 835, 103rd Cong., 2nd Sess. 45–46 (Oct. 4, 1994) U.S.Code Cong. & Admin.News 1994, pp. 3340, 3353–3355.[22] In those cases not requiring express authorization, the courts found

that it is a municipality because it could not take any action absent direction by the Treasurer.

The OCIP's control analysis is flawed, however, because in each case cited by the OCIP it was assumed that the debtor was an agency. The question of whether the debtor was a municipality then turned on whether the agency was controlled by a government authority. In cases where the agency was under public control, the debtor was deemed a public agency and, therefore, a municipality. *See, e.g., Id.* These cases are not applicable here because the OCIP is not an agency.

**20.** It is worth noting that in § 101(27) Congress chose to include "instrumentality ... of a county" in the definition of a "governmental unit" but not in the § 101(40) definition of a "municipality."

**21.** 11 U.S.C. § 109(c)(2) (1994). The phrase "generally authorized" was the result of a legislative compromise between the Senate's more restrictive "specifically authorized" and the House's more inclusive "not prohibited version." H.R.Conf.Rep. No. 938, 94th Cong., 2d Sess. 16–17 (1976).

**22.** *See Greene County,* 59 B.R. at 390–91; *In re Pleasant View Utility District,* 24 B.R. 632, 635 (Bankr.M.D.Tenn.1982); *In re City of Wellston,* 43 B.R. 348, 350 (Bankr.E.D.Mo.1984); *In re City of Bridgeport,* 128 B.R. 688, 696 (Bankr. D.Conn.1991) (cases not requiring express authorization); and *In re Carroll Township Authority,* 119 B.R. 61, 62 (Bankr.W.D.Pa.1990); *In re North and South Shenango Joint Municipal Authority,* 80 B.R. 57 (W.D.Pa.1982) (cases requiring express authorization).

the right to file bankruptcy by inference from the general powers that the municipality possessed, such as the power to control finances and the power to sue and be sued.[23]

In contrast, those courts requiring express authorization to file chapter 9 did not imply such power. For example, in *Carroll,* 119 B.R. at 62, the court cited the legislative history of section 109(c)(2) for the proposition that "absent . . . a requirement for affirmative action by the state, a serious constitutional question would be raised in connection with the Tenth Amendment." *citing* S.Rep. No. 989, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.C.C.A.N. 5787, 5896–97.[24] *See also Matter of North & South Shenango Joint Mun. Auth.* 14 B.R. 414 (Bankr.W.D.Pa. 1981) *rev'd* 80 B.R. 57 (W.D.Pa.1982).[25]

To remedy the split in the courts, Congress amended § 109(c) to require specific authorization. In other words, the courts could no longer find the requisite authorization for the filing by implication. The amendment requires that the state give the municipality express authority to file. Express authority is defined as "[t]hat which confers power to do a particular identical thing set forth and declared exactly, plainly, and directly with well-defined limits." *Black's Law Dictionary* 581 (6th ed.1990). Since a state acts by statute, the authorization obviously would be recorded in writing. It also must be exact, plain, and direct with well-defined limits so that nothing is left to inference or implication.

Despite the need for specificity, I see no reason why the state authorization can not be

---

**23.** Specifically, in *Greene County,* 59 B.R. at 390–91, the court held that the hospital was generally authorized to file bankruptcy for three reasons: (1) there was no statutory provision prohibiting the hospital from filing; (2) the pertinent code sections granted the hospital a plethora of powers to borrow money and enter other financial arrangements; and (3) other cases defined "generally authorized" broadly to infer the power to file chapter 9 from other sovereign powers.

In *Pleasant View,* 24 B.R. at 635, the question was whether the following language was sufficient to satisfy § 109(c)(2): "The district is empowered to do all acts necessary, proper or convenient in the exercise of the powers granted herein." The court then outlined the history of chapter 9 which reflected a broad interpretation of "generally authorized" and provided ready access to the bankruptcy courts. *Id.* at 635–638. Based on these considerations, the court held that the debtor was "generally authorized" to file bankruptcy. *Id.*

In *City of Wellston,* 43 B.R. at 350, the court found that, there was no state statute that authorized municipalities to file chapter 9. Nevertheless, the court found that Missouri state law provided broad powers to its political subdivisions to control its finances and enact any ordinance "not repugnant to the constitution and laws of [the] state." *Id.* Accordingly, the court held that the power to maintain the health, welfare and safety of the people included the power to file chapter 9. *Id.*

In *City of Bridgeport,* 128 B.R. at 696, the court held that although the state must affirmatively authorize its municipalities to file bankruptcy, that authorization does not require the words "bankruptcy", or "reorganization" or any variation thereof. *Id.* Instead, a debtor is "generally authorized" if it has authority over matters such as its own finances.

**24.** The *Carroll* court held that a municipal authority only has the power and authority granted

to it by enabling legislation. 119 B.R. at 63. These powers are not to be enlarged by a liberal construction of the enabling legislation. *Id.* In *Carroll,* the Pennsylvania legislature authorized the Department of Community Affairs to declare that certain "municipalities" were financially distressed, thereby allowing them to file chapter 9. *Id.* The debtor, a municipal authority, argued that because it had certain powers including the power to sue and be sued it was "generally authorized" to file chapter 9. *Id.*

The court disagreed. Pennsylvania defines a "municipality" as "every county, city, borough, incorporated town, township and home rule municipality." *Id.* at 64. The *Carroll* court held that because "municipal authorities" was not included in Pennsylvania's definition of a municipality, the debtor was not authorized to file bankruptcy. *Id.*

**25.** In *Shenango,* an entity that was created to construct and operate a sewer system filed chapter 9. 14 B.R. at 414. Pennsylvania law states that no political subdivision may file bankruptcy unless such petition had been approved by the state department of internal affairs. *Id.* at 417. There was no comparable prohibition for municipal authorities. *Id.* The municipal authority was authorized to do all things necessary to carry out the general welfare. *Id.* at 418. The bankruptcy court held that because the debtor was not prohibited from filing bankruptcy and the debtor had general sovereign powers, it was generally authorized to file bankruptcy. *Id.* at 420–421.

The bankruptcy court's holding was reversed by the district court which found that the municipal authority was not authorized to file chapter 9 without further explanation. *Shenango* 80 B.R. at 58.

by specific category. For example, the statute could authorize all "municipalities" as defined in the Code to file bankruptcy. As previously noted, the Code defines municipalities by categories. The state statute could also name the specific entities within certain categories. That was the approach previously taken in the 1937 Act by § 81. In either case, the authorization would appear to be sufficiently specific.[26]

The State of California has expressly authorized certain entities to file bankruptcy. Cal. Gov't Code § 53760 provides that: "Any taxing agency or instrumentality of this State, as defined in Section 81 of the act Congress entitled 'An act to establish a uniform system of bankruptcy throughout the United States approved July 1, 1898 may file....'" The OCIP argues that this language illustrates California's intention to authorize every California municipality to file bankruptcy so long as that municipality is eligible under federal law. This is too broad an interpretation of § 53760. Section 53760 was passed in 1949 and specifically refers to § 81 in the form it was in at that time. Section 81 is quite specific as to the type of entities that can file under chapter 9. As previously discussed, § 81 includes a laundry list of public entities that are authorized to file bankruptcy. *See supra* n. 15. However, § 81 does not refer to an investment fund. In fact, no specification even comes close.

The OCIP argues that in § 81(7) the language "or other municipality" can encompass the OCIP. But, that language is clearly a reference to other political subdivisions that might not be listed in that category. For the reasons previously stated, the OCIP is not a political subdivision.

Accordingly, the OCIP has not been specifically authorized to file chapter 9.

**The OCIP is insolvent.**

 Section 109(c)(3) requires that an entity be insolvent to qualify as a chapter 9 debtor. An insolvent municipality is one that is either not paying, or unable to pay, its debts when they come due.[27]

Movants argue that the OCIP is not insolvent because the OCIP has no "debts" and the OCIP participants are not "creditors." Instead, according to Cal Gov't Code § 27100.1 the OCIP is a trust.[28] Therefore, the OCIP assets belong to its participants, and no debtor-creditor relationship exists between the OCIP and its participants.

Movants' argument, however, ignores the Code's broad definition of claim and creditor. Pursuant to Code § 101(5)(A), a "claim" is defined as a right to payment.[29] The legislative history of the Code indicates that Congress intended to provide the broadest possible definition of "claim." *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266. A creditor is defined by Code § 101(10)(A) as an

---

**26.** The words in the amendment "in its capacity as a municipality or by name" follow the language "specifically authorized", and lend support to this interpretation. The phrase "in its capacity as a municipality" appears to reference the type of categories that historically have been used to define municipalities like "political subdivisions" and "public agencies." The phrase "or by name" likely refers to the approach taken in § 81 where the type of entities were specifically identified by name. Additionally, it is likely that the designation could be even more specific by identifying the municipality by actual name such as the "Yorba Linda Water District."

**27.** Section 101(32)(C) defines insolvency as follows: "[W]ith reference to a municipality, financial condition such that the municipality is (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due...."

**28.** Cal.Gov't Code § 27100.1 states:

Notwithstanding any other provision of law, when any public entity or any public official acting in a fiduciary capacity, who is required or authorized by law to deposit funds in the county treasury, makes a deposit, those funds shall be deemed to be held in trust by the county treasurer on behalf of the depositing entity or public official. The funds shall not be deemed funds or assets of the county and the relationship of the depositing entity or public official and the county shall not be one of creditor-debtor.

**29.** Section 101(5)(A) defines a claim as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...."

entity that has a claim against the debtor.[30] These terms were addressed by the Ninth Circuit in *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214 (9th Cir.1988), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). In *Bullion*, Bullion Reserve of North America ("BRNA") engaged in a Ponzi scheme, where it purported to buy and hold bullion on behalf of investors. *Id.* at 1216. Debtor did not fulfill its purchasing obligations but, instead, commingled investor funds and deposited them into its general bank accounts. *Id.*

Bozek, who was a program investor for three years, liquidated his account and received $212,138.60 in bullion. *Id.* Forty-two days later, BRNA filed for bankruptcy relief. *Id.* Subsequently, BRNA's bankruptcy trustee brought an action against Bozek under Code § 547 to recover the bullion as a preferential transfer.[31] *Id.*

Bozek argued that the bullion he received was not property of the debtor because the agreement he entered into with BRNA created an express trust under California law. *Id.* at 1217. The court disagreed because the evidence did not show that BRNA intended to assume the duties of a trustee. *Id.* at 1218. Moreover, even if an express trust had been created, Bozek could not enforce the trust without tracing his funds to purchased bullion. *Id.* Because Bozek could not trace, the bullion was considered property of BRNA. *Id.*

Bozek also argued that he was not a creditor of BRNA because he was paid in full on demand. *Id.* at 1218. The Ninth Circuit disagreed and held that Bozek immediately became a creditor when he transferred funds to BRNA because: (1) at that moment, he had a right to demand bullion; (2) this right, although unmatured, was a "claim" under the

Code; and (3) an entity with a claim is a "creditor."

Bozek further argued that the transfer was not on account of an antecedent debt because BRNA never owed him anything until the bullion transfer. Once again, the Ninth Circuit disagreed: "A debt is defined as a 'liability on a claim'. 11 U.S.C. § 101(11) (1982). The terms 'debt' and 'claim' are coextensive. When a creditor has a claim against the debtor, the debtor owes a claim to the creditor." [citations omitted]. BRNA accrued a debt when Bozek accrued a claim. The transfer was, therefore, on account of an antecedent debt.

Based on the foregoing, the OCIP is a debtor for two reasons. First, the *Bullion* case holds that the trust question does not determine the existence of a claim. Instead, a participant obtained a claim upon the transfer of funds to the OCIP irrespective of the existence of the trust. *Id.* Simultaneously, the OCIP has a debt on that claim, thereby creating a debtor-creditor relationship.

The OCIP also has debts to its participants even if the OCIP is a trust because participants cannot trace their funds in the OCIP. In general, a claimant to a commingled trust fund bears the burden of ascertaining and tracing the trust property.[32] *Elliott v. Bumb*, 356 F.2d 749, 754 (9th Cir. 1966). If the funds are dissipated and cannot be traced, then the claimant stands in the position of a general creditor with regard to those funds. *Kupetz v. United States (In re California Trade Technical Schools, Inc.)*, 923 F.2d 641, 648 (9th Cir.1991).

Finally, the OCIP is unable to pay its debts as they come due. The OCIP has suffered a $1.7 billion loss. The OCIP does not have the ability to generate revenues or satisfy all the withdrawal requests of the

---

**30.** Section 101(10)(A) defines a creditor as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor...."

**31.** Pursuant to § 547(b) a bankruptcy trustee may recover property for the benefit of the estate if there was a transfer of property of the debtor for the benefit of a creditor on an antecedent debt within 90 days of the bankruptcy. *Id.*

**32.** California trust law is not to the contrary. *Bullion*, 836 F.2d at 1218 n. 5 *citing Kobida v. Hinkelmann*, 53 Cal.App.2d 186, 127 P.2d 657, 661–62 (1942) (noting that when a trustee is insolvent, and the rights of other creditors are involved, a beneficiary must trace his funds through a trustee's commingled account).

OCIP participants. I, therefore, find that the OCIP is insolvent.

## The OCIP has satisfied the 109(c)(4) requirement.

■ The next issue is whether the OCIP desires to effect a plan to adjust its debts. Merrill Lynch contends that the OCIP cannot effect an adjustment plan because it has no debts to adjust. As shown above, however, this argument fails because the OCIP does have debts that could be the subject of an adjustment plan. Furthermore, the OCIP has proposed a comprehensive settlement agreement (the "CSA") with its participants and taken other steps that show a desire to effectuate a plan of adjustment of its debts as required by § 109(c)(4).[33]

## The impracticality exception to good faith negotiations before filing applies.

■ The next step is to determine whether the OCIP has satisfied at least one of the requirements of § 109(c)(5).[34] The

SDRMA contends that the OCIP has not complied with § 109(c)(5) because it failed to negotiate in good faith with its creditors prior to the filing of its chapter 9 petition. This argument ignores an exception to this requirement if negotiations are impracticable. Section 109(c)(5)(C). Congress enacted § 109(c)(5)(C) specifically "to cover situations in which a very large body of creditors would render prefiling negotiations impracticable." *Sullivan County*, 165 B.R. at 79 n. 55.[35] The impracticality requirement may be satisfied based on the sheer number of creditors involved. *See In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D.Colo.1990) ("It certainly was impracticable for [debtor] to have included several hundred Series D Bondholders in these conceptual discussions.").

Section 109(c)(5)(C) is directly applicable here where the OCIP has over 200 participants and hundreds of accounts with many complex accountings. Additionally, the event

33. The CSA is a voluntary agreement to liquidate the OCIP and distribute its proceeds to the OCIP participants. Under the terms of the OCIP, each settling participant (including the County) will receive a pro-rata cash distribution based on their relative deposits in the OCIP (approximately 79 cents on the dollar for non-County participants). The Non–County participants may then settle their deficiency claims against the County in one of two ways.

Under Option B of the CSA, the participant will retain all OCIP-related claims against the County and its officers, except the participant cannot seek recovery on any trust theory against funds distributed to the County from the OCIP.

Under Option A of the CSA, the participant will: (a) release their OCIP-related claims against the County; (b) assign to the County their rights respecting OCIP-related claims against third parties (e.g. Merrill Lynch); and (c) receive various County-issued promissory notes, some of which are secured against any award that the County receives in its litigation against third parties for OCIP-related damages.

With respect to (c), the CSA distinguishes between school and non-school participants. School participants will receive: (1) a principal amount of Recovery Notes (i.e. general obligations of the County that have superpriority over all other claims) which, when added to the aforementioned cash distribution, total approximately 90% of participants investment balance; and (2) other notes equal to the remainder of its investment balance. Non-school participants will receive: (1) a principal amount of Recovery Notes which, when added to the aforementioned cash distribution, total approximately 80% of the

participant's investment balance; and (2) other notes equal to the remainder of its investment balance.

All of the OCIP participants accepted the CSA. Ninety percent of the participants chose Option A with the remaining 10 percent choosing Option B. At a hearing on May 2, 1995, I approved the CSA as a fair and reasonable settlement.

34. Section 109(c)(5) provides in relevant part:

(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or. . . .

35. The legislative history of § 109(c)(5) indicates that it was enacted during the time of an impending bankruptcy filing by New York City. *Sullivan County* 165 B.R. at 79. Section 109(c)(5)(C) was necessary because it was otherwise impossible for a large municipality, such as New York, to identify all creditors, form the proper committees, and obtain the necessary consent in a short period of time. 4 *Collier, supra,* ¶ 900.03 at 900–24.

that caused the filing was the demand of lenders for additional collateral, which the OCIP could not meet, and the threat of liquidation of its portfolio. The OCIP had no time to enter into negotiations with its participants before acting to protect its portfolio assets.

**The OCIP petition was filed in good faith.**

 Turning to the issue of whether OCIP's petition was filed in good faith. Pursuant to § 921(c), the court has discretion to dismiss a petition if it finds that the petition was not filed in good faith. *Sullivan County,* 165 B.R. at 79. Good faith in the chapter 9 context is not defined in the Code and the legislative history of § 921(c) sheds no light on Congress' intent behind the requirement. *Id.* at 80. The courts have, therefore, applied to chapter 9 cases the judicial reasoning that developed in chapter 11 cases. *See, e.g., Id.* at 81; *Castle Rock,* 145 B.R. at 81 ("Determining whether a [chapter 11] petition has been filed in good faith requires an evaluation of a debtor's 'financial condition, motives, and the local financial realities.' These comments would appear to be equally applicable, at least in part, to a Chapter 9 petition.") (citations omitted).

 The Ninth Circuit test for good faith in a chapter 11 case is whether the debtor is attempting to unreasonably deter and harass its creditors or attempting to effect a speedy, efficient reorganization on a feasible basis. *In re Marsch,* 36 F.3d 825, 828 (9th Cir. 1994), *citing In re Arnold,* 806 F.2d 937, 939 (9th Cir.1986). Moreover, the purpose of the filing must be to achieve objectives within the legitimate scope of the bankruptcy laws. *Id.*

In this context, the OCIP filed its petition in good faith. No evidence has been presented that the OCIP filed for illegitimate reasons. The OCIP filed to protect its assets and allow it the opportunity to work out an adjustment of its debts in an orderly way. H.R.Rep. No. 595, 95th Cong., 1st Sess. 263 (1977) (general policy of chapter 9 is to give a debtor a breathing spell from debt collection efforts so that it can work out a repayment plan with creditors); *Commodity Credit Corporation v. Tarnow (In re Tarnow),* 35 B.R. 1014, 1017 (N.D.Ind.1983) (two major purposes for bankruptcy are to give the debtor a fresh start and provide for a fair and orderly distribution of assets among creditors) *rev'd on other grounds* 749 F.2d 464 (7th Cir.1984). Nothing in the record indicates that the OCIP has attempted to unreasonably deter and harass its creditors. Rather, from the beginning, the OCIP has moved quickly toward resolving its problems. The CSA that was proposed within four months of the filing demonstrates that the OCIP has moved quickly to deal with a very difficult and complex case.

Merrill Lynch argues that the case should be dismissed because the County had objectives other than reorganization when it filed its petition. Those objectives were allegedly as follows: (1) to put the County's funds out of its reach, thereby exacerbating, or even creating the County's insolvency; (2) to gain control over the allocation of losses suffered by the OCIP, thereby favoring the County's interests at the expense of the other participants; (3) to use the bankruptcy process as a leveraging tool to coerce the OCIP participants to settle their claims; and (4) to forestall being called to account to the OCIP participants for the losses, and, at the same time, to force the non-County participants to join the County in its litigation against Merrill Lynch.

The OCIP responds that this case was filed in good faith as shown by the following: (1) this case provides a distinct forum in which to resolve various claims to the OCIP funds; (2) the case will allow the funds to be distributed in an orderly fashion; (3) the OCIP has moved quickly to resolve the case; and (4) none of the OCIP participants have raised a good faith objection to the filing.

Merrill Lynch has submitted no evidence of a bad faith filing. The reasons for the filing of this case have been well documented. As previously discussed, protection of assets and resolution of claims that exceed the value of the OCIP assets are good and valid reasons for the filing. Although the County may have had some doubts as to whether the filing could satisfy all the requirements of 109(c), it had reasonable legal arguments why the filing should be upheld. Its strategy

that a separate filing by the OCIP might facilitate the quick disbursement of funds from the OCIP proved correct. This was not a bad faith calculation.

**What are the effects of dismissal?**

 Now that it has been determined that this case should be dismissed, the OCIP Committee conditionally requested in its response that the court affirm all orders in the case pursuant to § 349(b).[36] The main objective of § 349(b) is to undo the bankruptcy case and, as far as practicable, restore all property rights to the position they occupied at the commencement of the case. H.R.Rep. No. 595, 95th Cong., 1st Sess. 338 (1977). However, § 349(b) expressly reserves to the bankruptcy court "the power to alter the normal effects of the dismissal of a bankruptcy case if cause is shown" to protect rights acquired in reliance on the case. *In re Pocklington*, 21 B.R. 199, 202 (Bankr.S.D.Cal. 1982).

Accordingly, the OCIP Committee should schedule a hearing on the § 349(b) request. The OCIP shall prepare the order of dismissal and lodge it in accordance with Local Rule 116.

### CONCLUSION

In summary, the OCIP is not eligible for chapter 9 relief because it is not a municipality and it has not been specifically authorized to file chapter 9.

This memorandum opinion constitute my findings of fact and conclusions of law in support of Order Dismissing the Orange County Investment Pools' Bankruptcy Petition.

---

[36]. Section 349(b) states:

(b) Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title—

(1) reinstates—

(A) any proceeding or custodianship superseded under section 543 of this title;

(B) any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or preserved under section 510(c)(2), 522(i)(2), or 551 of this title; and

(C) any lien voided under section 506(d) of this title;

(2) vacates any order, judgment, or transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title; and

(3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.