**In re CITY OF VALLEJO, Debtor.**

**International Association of Firefighters, Local 1186; Vallejo Police Officers' Association; International Brotherhood of Electrical Workers Local 2376, Appellants,**

v.

**City of Vallejo; Union Bank, N.A.; Wells Fargo Bank, N.A., Appellees.**

**BAP No. EC-08-1244-JuMkMo.**

**Bankruptcy No. 08-26813.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Submitted on April 23, 2009.

Filed June 26, 2009.

Katherine Thomas, Washington, DC, Marc A. Levinson, Norman C. Hile, Sacramento, CA, for Debtor.

Robert T. Matsui, Sacramento, CA, for trustee.

Before: JURY, MARKELL, and MONTALI, Bankruptcy Judges.

## OPINION

JURY, Bankruptcy Judge.

After months of fiscal manipulations to increase its worsening cash flow and ultimately unsuccessful negotiations with its labor unions, the City of Vallejo ("Vallejo") filed a chapter 9 bankruptcy petition.[1] Vallejo asserted it was insolvent and otherwise met the eligibility requirements under § 109(c).

Appellants[2], some of Vallejo's unions, appeal the bankruptcy court's order that Vallejo was eligible to file under chapter 9.

We conclude that, based on admissible evidence, the bankruptcy court correctly found that Vallejo was insolvent. In addition, we hold that the record supports the bankruptcy court's finding that Vallejo desired to effectuate a plan under § 109(c)(4). We determine that the bankruptcy court erred in concluding that Vallejo satisfied § 109(c)(5)(B) by employing an incorrect legal standard. This error, however, was harmless because the bankruptcy court's finding that the provisions

of § 109(c)(5)(C) were met was correct and this alternative finding satisfies the statutory eligibility requirements. Accordingly, we AFFIRM.[3]

## I. FACTS

On paper, Vallejo appeared financially sound in July 2007. Its audited financial statement (called a Comprehensive Annual Financial Report ("CAFR")) for the fiscal year that ended on June 30, 2007,[4] showed nearly $1 billion in total assets and $624.5 million in net assets in excess of liabilities. Its financial statement also reported $211 million of cash and investments as of June 30, 2007, of which nearly $137 million was characterized as "unrestricted" and "available for operations".[5]

Vallejo's use of general labels like "unrestricted" and "available for operations" failed to convey restrictions on many of the underlying funds. Consequently, the CAFR's snapshot of Vallejo's financial health was initially misleading. Closer examination revealed that much of Vallejo's surplus cash and investments belonged to funds that were restricted by law or grant to specific uses and could not be used for operational costs.

---

1. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

2. The International Association of Firefighters, Local 1186, the Vallejo Police Officers' Association and the International Brotherhood of Electrical Works, Local 2376 are collectively referred to as the "Unions". The Vallejo Police Officers' Association reached an agreement with Vallejo and withdrew from this appeal.

3. We also certify the bankruptcy court's order to the Ninth Circuit Court of Appeals under 28 U.S.C. § 158(d)(2) and Rule 8001(f)(4) because the order involves a matter of public importance. *Ransom v. MBNA Am. Bank,*

*N.A. (In re Ransom),* 380 B.R. 809, 811–813 (9th Cir. BAP 2007).

4. Vallejo operated on a non-calendar fiscal year which began on July 1st and ended on June 30th. Vallejo filed for bankruptcy near the end of the 2007–2008 fiscal year. The CAFR for fiscal year ending on June 30, 2007 referred to the 2006–2007 fiscal year.

5. Vallejo reported its finances in multiple funds because generally accepted accounting principles ("GAAP") as promulgated by the Governmental Accounting Standards Board ("GASB") require municipalities to account for their activities in separate funds. The segregation permits a transparent reporting process that reflects the financial activities of each fund and complies with restrictions placed on the funds.

The evidence presented at trial showed that Vallejo held most of its unrestricted funds in its General Fund, which could be used for any purpose, including operations and labor costs such as the salaries of firefighters or city electricians. The General Fund shouldered most of the costs of municipal services and was the purse of last resort.

In prior fiscal years, Vallejo used its General Fund reserves to cover shortfalls in other funds. For that reason, the General Fund had suffered multimillion dollar deficits in the prior three fiscal years. By the end of the 2007–2008 fiscal year, the reserves were exhausted. Vallejo projected the General Fund deficit at $17 million for the 2007–2008 fiscal year, with labor costs alone outstripping its revenues. It also projected that the General Fund would bleed into a deficit of $22.7 million by November 2008.

The record also shows that Vallejo estimated its General Fund revenues would be about $77.9 million in the 2008–2009 fiscal year ($5.3 million less than the prior fiscal year) as a result of falling sales taxes, real property taxes, and motor vehicle license fees, among others. Conversely, Vallejo estimated that its General Fund expenditures for the upcoming 2008–2009 fiscal year would be $95 million ($7 million more than in the 2007–2008 fiscal year).

Vallejo prepared a new budget projection shortly before filing its petition based on a $1.4 million infusion and an absence of union contracts. Despite the liberal assumptions employed, the 2008–2009 fiscal year General Fund deficit remained at over $10 million.

Due to the deficits, the General Fund could not borrow funds from other, restricted, city funds for periods less than a year because city funds could not borrow money from other city funds unless the city had a balanced budget or a demonstrated ability to repay the borrowed money within the fiscal year. The General Fund also could not borrow from private credit markets because it had no reserves and insufficient cash flow to pay back loans. As a result, Vallejo was unable to pay General Fund obligations in the 2008–2009 fiscal year. In the end, due to an inability to borrow, Vallejo's fiscal situation became bleak.[6]

Vallejo searched for ways to improve its financial situation, but various state laws limited its ability to generate new revenues.[7] It considered a number of proposals, including increasing the garbage franchise fees, selling surplus real estate, charging a fee for false 911 calls, and filing claims with the State of California. Vallejo concluded, however, that the proposed revenue enhancements provided only insignificant new revenues, were too costly or speculative to implement immediately, or provided one-time boosts at best.

The timing for receiving the bulk of revenues was also problematic. Vallejo's primary source of revenue was property taxes, and these were received only twice a year, in April and December. Additionally, many of Vallejo's funds that relied on federal or state grants had to spend the money before seeking reimbursement. Thus, many of Vallejo's funds operated at a deficit for parts of the year.

6. By early July 2008, Vallejo's General Fund cash flow was $1.6 million short of covering the 2008–2009 fiscal year's first payroll.

7. Proposition 13 capped property tax rates to 1% of full cash value. Proposition 218 limited Vallejo's ability to raise any other taxes without a majority vote. Article XVI, section 18 of the California Constitution also restricted its ability to borrow funds. The provision barred Vallejo from incurring a debt which it could not repay from revenues attributable to the same year without voter approval.

Vallejo also began to cut expenses. Since 2003, Vallejo eliminated eighty-seven employee positions and severely reduced or eliminated numerous community services such as infrastructure programs. In the 2007–2008 fiscal year, Vallejo cut about $10 million in funding for programs and services not mandated by contract.

Next, Vallejo attempted to address its largest liability, labor costs, which it projected to make up $79.4 million of its $95 million expenditures in 2008–2009 fiscal year. Accordingly, Vallejo opened discussions with the Unions to alter their collective bargaining agreements ("CBAs") in November 2007.

In March 2008, after negotiating for several months, Vallejo and the Unions agreed to temporary modifications of the CBAs.[8] The modifications would be effective through the end of Vallejo's 2007–2008 fiscal year, terminating on June 30, 2008. The savings and a one-time $2.4 million transfer from nonrestricted funds permitted Vallejo to avoid projected insolvency through June 30, 2008.

In the interim, Vallejo and the Unions agreed to mediate a long-term solution. The parties met with a mediator eleven times, corresponded informally and exchanged several written proposals between March and mid-May 2008. No agreement was reached.

Vallejo also began discussions with Union Bank, N.A. ("Union Bank") in March 2008. As the holder of $47 million in Vallejo's bonds, Union Bank was Vallejo's largest single creditor. Union Bank also acted as the Indenture Trustee for the holders of three other bond issuances.[9]

The parties discussed lowering the interest rate on the bonds. Customarily, Union Bank would not support these changes unless Vallejo provided a multi-year cash flow projection. Vallejo could not formulate a reliable projection for Union Bank until it reached an agreement with the Unions. Ultimately, absent an agreement with the Unions, Vallejo's discussions with Union Bank stalled in April 2008.

With the fiscal year and interim agreements with the Unions ending and no prospect of extension, the city council authorized Vallejo to file a petition under chapter 9 on May 6, 2008. The Unions responded with a counteroffer two days later.

Vallejo's last proposal to the Unions was made on May 14, 2008 and the Unions' counteroffer two days later. The counteroffer included one-time pay cuts and deferred previously owed pay raises, but included onerous terms like a four-year extension of the CBAs with corresponding salary increases for those years and eventual reinstatement of the deferred salary increases. The Unions also offered to extend the interim agreements through the 2008–2009 fiscal year. Vallejo rejected the counteroffer because it could not meet the terms and the counteroffer did not provide a long-term solution.

During its negotiations with the Unions, Vallejo never discussed a plan of adjustment under chapter 9. Rather, the evidence shows the parties discussed how a bankruptcy would affect the Unions; *i.e.,* what claim the Unions would have and how their claim could be augmented by extending the CBAs before the petition date. The Unions proposed a four-year exten-

---

8. Vallejo's city staff recommended to the city council that Vallejo file for bankruptcy before it modified the CBAs with the Unions in early March.

9. Wells Fargo Bank, N.A. ("Wells") is an indenture trustee for approximately $100 million of municipal bonds and other debt instruments Vallejo had issued prior to filing its chapter 9 case.

sion of the CBAs in their last counteroffer to ensure a larger claim if Vallejo accepted the counteroffer but later filed for bankruptcy.

With no agreement with the Unions in place, Vallejo filed its petition on May 23, 2008. The Unions objected to the petition on the ground that Vallejo did not meet the eligibility requirements under § 109(c).

After an eight day trial, the court ruled that Vallejo was insolvent as of the petition date because the city's General Fund would (1) begin the fiscal year 2008–2009 with no reserves (and possibly with a negative balance); (2) operate at a multi-million dollar deficit in fiscal year 2008–2009; and (3) would not have sufficient available funds and cash flow to pay Vallejo's debts as they became due—in particular, Vallejo "would not have been able to pay the General Fund payroll that became due on July 11, 2008." The court also observed that without a balanced budget for the fiscal year 2008–2009, Vallejo "could not demonstrate the ability to pay back any loan with revenues generated in fiscal year 2008–09." Thus, it could not "lawfully borrow from the private market or other city funds."

The court also determined that the "evidence established the City desires to effect a plan . . . ." and that "to the extent possible, the City negotiated with its creditors prior to filing its petition." Based on its careful consideration of the testimony and documents submitted into evidence, the bankruptcy court held that Vallejo had satisfied the requirements under § 109(c) and entered an order for relief.[10]

The Unions timely appealed that order. Following oral argument, we requested, and the parties provided us, with additional information and briefing.[11]

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. § 1334 over this core proceeding under § 157(b)(2). We have jurisdiction under 28 U.S.C. § 158(a)(3).[12]

## III. ISSUES

A. Whether the bankruptcy court erred in finding Vallejo was insolvent under § 109(c)(3).

B. Whether the bankruptcy court erred in finding that Vallejo desired to effect a plan to adjust its debts under § 109(c)(4).

C. Whether the bankruptcy court erred in finding that Vallejo negotiated with its creditors in good faith under § 109(c)(5)(B).

D. Whether the bankruptcy court erred in finding that Vallejo was unable to negotiate with its creditors because to do so was impracticable under § 109(c)(5)(C).

E. Whether Union Bank and Wells have standing as appellees.[13]

## IV. STANDARDS OF REVIEW

■ We review the bankruptcy court's conclusions of law and questions of statuto-

---

10. Shortly after its filing, Vallejo was able to balance its budget and borrow funds by implementing a Pendency Plan. The Pendency Plan modified salaries, fringe benefits, staffing requirements and work rules, froze all employee compensation at the levels paid as of the petition date and cut spending for community services.

11. In light of our ruling on Ms. Mayer's testimony, it is unnecessary to decide the motion to strike.

12. The order appealed is interlocutory. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs)*, 339 F.3d 782, 792 (9th Cir.2003). We thus granted leave to hear this appeal under 28 U.S.C. § 158(a)(3).

13. Union Bank and Wells (collectively the "Banks") requested leave to participate in this appeal; the Unions opposed. By order entered on December 17, 2008, we authorized the Banks to file briefs, but deferred the ques-

ry interpretation de novo and its factual findings for clear error. *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 32 (9th Cir. BAP 2008).

■ We review the bankruptcy court's insolvency decision under the clearly erroneous standard. *See Arrow Elecs., Inc. v. Justus (In re Kaypro)*, 218 F.3d 1070, 1073 (9th Cir.2000). A factual determination is clearly erroneous if the appellate court, after reviewing the record, has a definite and firm conviction that a mistake has been committed. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse it even though convinced that we might have weighed the evidence differently. *Id.* at 574, 105 S.Ct. 1504.

## V. DISCUSSION

Section 109(c) provides in relevant part: "[A]n entity may be a debtor under chapter 9 if and only if such entity ...—(3) is insolvent; (4) desires to effect a plan to adjust such debts; and ... (5)(B) has negotiated in good faith with creditors and has failed to obtain agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter; [or](C) is unable to negotiate with creditors because such negotiation is impracticable...." Chapter 9

petitioners must meet the mandatory provisions of § 109(c)(1)-(4) and one of the requirements under § 109(c)(5) to be eligible for an order for relief.

■ Section 921(c) provides that the bankruptcy court *may* dismiss the petition if the debtor does not meet the requirements under § 109(c). Despite the permissive statutory language, courts have construed § 921(c) to require the mandatory dismissal of a petition filed by a debtor who fails to meet the eligibility requirements under § 109(c). *See In re County of Orange*, 183 B.R. 594, 599 (Bankr. C.D.Cal.1995); *See also* 6 *Collier on Bankruptcy* ¶ 921.04[4] at 921–7 (Alan N. Resnick & Henry J. Sommer eds., 15th ed.2009) [hereinafter *Collier* ]. Therefore, we consider whether the bankruptcy court should have dismissed Vallejo's petition.

■■ "The burden of establishing eligibility under § 109(c) is on the debtor." *In re Valley Health Sys.*, 383 B.R. 156, 161 (Bankr.C.D.Cal.2008).[14] We construe broadly § 109(c)'s eligibility requirements " 'to provide access to relief in furtherance of the Code's underlying policies.' " *Id.* at 163 (quoting *Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.)*, 143 F.3d 1381, 1384 (10th Cir.1998)).

### A. Insolvency: Section 109(c)(3)

A municipality is insolvent if it is not paying its debts as they come due or is unable to do so. *See* § 101(32)(C)(i) and (ii). The bankruptcy court concluded that insolvency under § 101(32)(C)(ii) is deter-

---

tion of whether they have standing to participate in this appeal until after the hearing.

**14.** The Unions assert the more rigorous clear and convincing burden of proof should apply in the context of chapter 9 eligibility determinations. Their reasoning for applying the higher burden of proof is that municipal bankruptcies raise important constitutional issues and do not provide much creditor pro-

tection. The Unions cited no case law in support of their position, and we have found none. If Congress wished to impose a special heightened burden of proof in this context, we would have some indication from the language of the statute or its legislative history. *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). There is none here.

mined on a cash flow basis, which required Vallejo to demonstrate an inability to pay its debts due within the next year.

The Unions argue that the bankruptcy court erred in its insolvency analysis and determination for several reasons. First, they contend that Vallejo had enough cash on hand to continue operating without changing its budget. The Unions maintain that the bankruptcy court should have extrapolated from the CAFR that Vallejo was solvent because it had $137 million in cash and investments in funds that were "unrestricted" and "available for operations".[15] Next, the Unions argue that there is no admissible evidence supporting Vallejo's assertion that some of its funds were restricted. Lastly, the Unions assert Vallejo could have avoided its deficits by: (1) making more budget cuts; (2) employing more realistic staffing level assumptions in its projections; and (3) accepting the Unions' offer to extend the March 2008 modification to the CBAs.

■ For the reasons set forth below, we conclude that the bankruptcy court did not commit any error in its ruling on insolvency.

### 1. The CAFR Did Not Establish Vallejo Had Sufficient Unrestricted Funds To Operate

The Unions' reliance on the CAFR to prove Vallejo's solvency is misplaced. The CAFR showed the assets held by Vallejo's component agencies as of June 30, 2007. It does not delve into the details of the various funds held by each component agency. Nor does the report reflect the liabilities tied to each component agency or its funds. The report therefore is more akin to the asset side of a balance sheet. As such, it has limited persuasiveness regarding cash flow insolvency under § 101(32)(C)(ii). *See In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 84 (Bankr.D.Colo.1990)(balance sheet assets are not dispositive for insolvency).

Moreover, the CAFR's omission of liabilities inflated Vallejo's financial well-being. It also presented a financial snapshot as of June 30, 2007, almost a year before Vallejo's filing date. New facts and circumstances arose between June 30, 2007 and the petition date which rendered the CAFR an imprecise description of Vallejo's financial situation as of May 23, 2008. Accordingly, the CAFR alone does not prove that Vallejo was solvent.

### 2. There Was Sufficient Evidence That Showed Many Of Vallejo's Funds Were Restricted

Still, Vallejo cannot squirrel away money it can use for operations in a fund, argue the fund is restricted and then claim insolvency.

---

**15.** Page 41 of the CAFR, provides in relevant part:

*Statement of Net Asets*

Cash and investments available for operation:

City

| | | |
|---|---|---|
| General Fund | $ 2,609,264 | |
| Redevelopment Agency | 9,402,994 | |
| Housing Authority | 16,627,718 | |
| Other Funds | 60,225,469 | |
| Total, City | | $ 88,865,445 |
| Marine World JPA | | 3,335,936 |
| Sanitation & Flood Control | | 44,480,126 |
| | | 136,681,507 |

The Unions argue Vallejo could have siphoned money from certain funds to support its General Fund. Vallejo counters that its funds were restricted by law or grant. The Unions raise for the first time in their reply brief the argument that the bankruptcy court erred in making evidentiary rulings which permitted Vallejo's witness to testify as to whether certain funds were restricted.[16] The Unions objected to the declarations of Susan Mayer ("Mayer"), Vallejo's Assistant Finance Director, on the ground that her testimony constituted improper lay opinion, was hearsay and violated the best evidence rule.

The Unions contend that Mayer's testimony regarding whether certain City funds were restricted comprised inadmissible legal opinion. In that regard, the Unions maintain that the issue of whether Vallejo's cash was restricted by statutes, ordinances, city council resolutions, and contractual covenants was a legal question that should have been determined by the bankruptcy court. The bankruptcy court overruled the Unions' evidentiary objection to Mayer's declarations, finding that her testimony did not constitute a legal conclusion and was proper lay opinion.[17]

Generally, a witness's legal conclusions are inadmissible under the Federal Rules of Evidence. *Evangelista v. In-landboatmen's Union of Pac.*, 777 F.2d 1390, 1398 n. 3 (9th Cir.1985). The trial court, however, has a "relatively wide degree of discretion in admitting or excluding testimony which arguably contains a legal conclusion...." *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir.1985). "This discretion is appropriate because it is often difficult to determine whether a legal conclusion is implicated in the testimony." *Id.*

Moreover, in some circumstances, "opinion testimony that arguably states a legal conclusion is helpful to the jury, and thus, admissible." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 704.04[2][a] (2d ed.2009); *Compare Peckham v. Cont'l Cas. Ins. Co.* 895 F.2d 830, 837 (1st Cir.1990)(finding expert opinion evidence as to proximate cause admissible since it could be expected to shed some light on complex insurance law area) *with Torres*, 758 F.2d at 150–51 (finding it was error for court to admit lay opinion testimony couched as legal conclusion because it was not helpful to the jury, but such error was harmless).

We review the bankruptcy court's admission of Mayer's testimony under an abuse of discretion standard. *Johnson v. Neilson (In re Slatkin)*, 525

---

16. An appellant's failure to "specifically and distinctly" argue an issue in its opening brief constitutes a waiver of that issue. *Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir.2004). However, if the failure to review an issue would result in manifest injustice or would not prejudice the defense of the opposing party, an appellate court may address an issue that was not raised in an opening brief. *Id.* Our order permitting supplemental briefing on these evidentiary issues precluded any possible prejudice because it allowed the parties to fully explore the Unions' evidentiary objections. *See United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 930 (9th Cir.2001).

17. The court opined that Mayer was "merely setting out her interpretation. She has to apply the law to Vallejo's finances and she's saying how she's done that and how she's interpreted the financial records." The court explained that Mayer's testimony was "entirely proper given her position with Vallejo. She's not telling what's in documents. She's saying the impact of these documents on Vallejo's finances." We need not reach the close question whether the court's ruling in this regard was correct because we conclude that the court did not abuse its discretion in admitting the testimony as it was helpful to it as the trier of fact.

F.3d 805, 811 (9th Cir.2008).[18] "To reverse on the basis of an erroneous evidentiary ruling, we must conclude not only that the bankruptcy court abused its discretion, but also that the error was prejudicial." *Id.* Under this standard of review, we reject the Unions' claim.

■■■ Under Federal Rule of Evidence 701, lay opinion testimony must be helpful to the trier of fact.[19] FED.R.EVID. 701. Mayer's opinion regarding the restrictions put on certain funds was helpful to the fact finder because of the complexity of municipal accounting practice. This practice includes a mix of laws authorizing the creation of funds; laws restricting the use of funds; facts as to the current amounts available in particular funds; laws de-authorizing the funds; laws loosening the restrictions; laws tightening the restrictions; laws and facts regarding the source of financing for the funds; and facts as to Vallejo's discretionary allocation of amounts in the funds. Further, some of the legal enactments were municipal, some state and some federal. In total, the enactments covered a time spectrum of approximately 30 years.[20]

Finally, Mayer's testimony was helpful in terms of judicial efficiency. Instead of Mayer's summary testimony, the evidence would have entailed presenting law that showed why each single fund was restricted. The court would have needed to rule on whether each and every one of Vallejo's myriad funds was restricted in the pertinent time frame. The most concise manner for Vallejo to prove that many of its funds were restricted was through Mayer's testimony.

Admission of this evidence is supported by Ninth Circuit law:

> Opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury in such a way as to enable the jury to form an opinion or reach an intelligent conclusion. If it is impossible or difficult to reproduce the data observed by the witness, or the facts are difficult of explanation, or complex, or are of a combination of circumstances and appearances which cannot be adequately described and presented with the force and clearness as they appeared to the witness, the witness may state his impressions and opinions based on what he observed.

*United States v. Skeet,* 665 F.2d 983, 985 (9th Cir.1982). These principles apply to a bench trial as well.

We also observe that the Unions had the opportunity to reveal defects in Mayer's judgment or the inaccuracy of her perceptions by conducting cross examination and presenting their own evidence.

---

18. Although the admission of evidence is reviewed under an abuse of discretion standard, the bankruptcy court's interpretation of the Federal Rules of Evidence is subject to de novo review. *See Pierce v. County of Orange,* 526 F.3d 1190, 1200–01 (9th Cir.2008). The panel finds that the bankruptcy court made no errors of law in its interpretation of the evidentiary rules.

19. Fed.R.Evid. 701 also requires that the opinion testimony be rationally based on the perception of the witness. Mayer's testimony was based on her perceptions as the City's Vallejo's Assistant Finance Director since 2005 and her other experience. *E.g., Bank of China v. NBM LLC,* 359 F.3d 171, 181–182 (2d Cir.2004) (permitting perceptions based on role in enterprise). In its findings, the bankruptcy court highlighted the "thorough knowledge of municipal accounting and Vallejo's finances in particular" that Mayer displayed during cross-examination.

20. This complexity was amply illustrated by the table of legal restrictions submitted by Vallejo in response to our second request for supplemental briefing.

Under these circumstances, even if May-er's testimony arguably contained legal conclusions, given a court's wide latitude in this arena, we cannot unequivocally say the bankruptcy court abused its discretion. *Unitec Corp. v. Beatty Safway Scaffold Co. of Or.*, 358 F.2d 470, 478 (9th Cir.1966) (noting that it is more difficult to find an abuse of discretion in a bench trial than a jury trial).

Based on Mayer's testimony, Vallejo prepared a chart summarizing its various funds and the restrictions on each fund. The Unions failure to object to the admissibility of the chart further supports our conclusion. For all these reasons, we are satisfied that the bankruptcy court properly admitted her testimony regarding the restrictions on certain City funds.[21]

### 3. The Bankruptcy Court's Findings Regarding Vallejo's Fiscal Prudence Are Not Clearly Erroneous

According to the Unions, Vallejo should have pillaged all of its component agency funds, ignoring bond covenants, grant restrictions, and normal GASB and GAAP practices, to subsidize its General Fund. The bankruptcy court found that taking such actions defied fiscal prudence.

Our role is not to reweigh the evidence presented to the bankruptcy court. Here, the bankruptcy court's "account of the evidence is plausible in light of the record when viewed in its entirety." *Anderson*, 470 U.S. at 574, 105 S.Ct. 1504. The Un-

ions' suggestion would leave Vallejo more debilitated tomorrow than it is today. Under their reasoning, the assets of restricted funds would be spent, yet revenues would continue plummeting and expenses would continue surging.

The Unions' own expert witness testified the General Fund would experience another deficit in fiscal 2008–2009. The Unions' expert further admitted that Vallejo had to comply with GASB when doing financial planning and preparing its financial statements. Moreover, the Unions' expert did not identify a single fund Vallejo could use to unravel its solvency crisis. Effectively, raiding funds for short-term needs would simply cripple Vallejo more.

### 4. Vallejo Could Not Avoid Deficits

Alternatively, the Unions argue Vallejo could have avoided bankruptcy if it had made many minor changes. The Unions assert that if Vallejo had taken the Unions' final offer to extend the March 2008 modification of the CBAs, Vallejo could have operated for another year. The Unions also contend that Vallejo's projections were based on an erroneous assumption that the police and firefighters would be fully staffed. Lastly, the Unions assert Vallejo could trim its budget by cutting quality of life programs like Meals on Wheels and deferring maintenance on its vehicle fleet. For several reasons, the bankruptcy court found the Unions' contentions illusory.

---

**21.** Mayer's discussion of several documents did not violate the best evidence rule. Her testimony was offered to prove the cumulative effect of documents on Vallejo's finances, *i.e.*, that Vallejo had financial obligations in excess of its ability to pay, and not to prove the contents of a particular document. *See Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1318–19 (9th Cir.1986). Mayer's testimony was not hearsay either. Hearsay is "a statement other than one made by the declarant while testify-

ing at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED.R.EVID. 801(c). Mayer's testimony regarding documents not introduced into evidence was relevant to establish the obligations they created for Vallejo; it was not for the purpose of advancing the truth of the statements made in the documents. *See, e.g., NLRB v. H. Koch & Sons*, 578 F.2d 1287, 1290–91 (9th Cir.1978) (permitting testimony introduced to demonstrate legal effect).

First, to the extent the Unions' offer would keep Vallejo out of bankruptcy for the next fiscal year, the offer would not provide long term solvency beyond the first year. The offer imposed new onerous terms like 3–5% annual salary increases on top of the deferred 6.5% increase. The deferred 6.5% increase, suspended by the March 2008 modification, would either be reinstated by the start of the 2009–2010 fiscal year or by March 1, 2009. Once reinstated, the 6.5% increase would drive the General Fund back into a deficit. Thus, the bankruptcy court found Vallejo's acceptance of the offer would not have balanced its budget.

Second, the bankruptcy court found Vallejo did not erroneously over-budget based on an assumption of full staffing. Due to the minimum staffing requirements for firefighters and the overtime paid to meet those requirements, Vallejo would not have realized any cost savings. The court noted the Unions' evidence failed to account for lost revenue based on vacant, reimbursable positions.[22] Some of those reimbursable positions came from the police and fire departments. Also, due to the unprecedented number of employee departures, Vallejo had to pay $5.3 million in payout obligations. Yet, the Unions' witness did not account for the costs of anticipated departures in his staffing analysis.

Third, Vallejo already cut much of its discretionary budget. Vallejo reduced employee rolls and continuously cut funding to services like the senior center, library and parks. Alarmingly, most of Vallejo's vehicles were near the end of their expected lives and many of the vehicles had already been extended past that life. Vallejo could have cut more services, but the court found that it had reduced expenditures to the point that municipal services

were underfunded. More importantly, the court found further funding reductions would threaten Vallejo's ability to provide for the basic health and safety of its citizens.

In sum, whether Vallejo was insolvent is a factual finding reviewed for clear error. The existence of contrary but equally plausible inferences does not render the bankruptcy court's findings of fact clearly erroneous. *Anderson*, 470 U.S. at 574, 105 S.Ct. 1504 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). The court properly admitted Mayer's testimony, which it found credible. Our review of the record shows that the Unions did not provide evidence that conclusively contradicted her testimony nor do they point out to us any such evidence for our consideration in this appeal. The bankruptcy court's findings that Vallejo could not have avoided the deficits it faced for the 2008–2009 fiscal year is supported by the record and cannot be overturned. In short, we hold that the record as a whole supports the court's inferences and findings that as of the petition date, Vallejo was unable to pay its debts as they became due.

Accordingly, we perceive no error in the bankruptcy court's rulings.

### B. Desire to Effect a Plan: Section 109(c)(4)

 "An entity may be a debtor under chapter 9 of this title if and only if such entity ... desires to effect a plan to adjust such debts." § 109(c)(4). The Unions assert that the bankruptcy court erred in finding Vallejo met this requirement because: (1) Vallejo took no post-petition actions to confirm a plan of adjustment;

---

**22.** If the vacant positions had been filled, Vallejo would have been entitled to reimbursement, so there would be no net effect on the cash flow.

and (2) the evidence demonstrated Vallejo filed the case in bad faith to simply break union contracts.

Few published cases address the requirement that a chapter 9 petitioner "desires to effect" a plan of adjustment. Those cases that have considered the issue demonstrate that no bright-line test exists for determining whether a debtor desires to effect a plan because of the highly subjective nature of the inquiry under § 109(c)(4). *Compare In re County of Orange,* 183 B.R. 594, 607 (Bankr.C.D.Cal. 1995) (proposal of a comprehensive settlement agreement among other steps taken demonstrated efforts to resolve claims which satisfied § 109(c)(4)) *with In re Sullivan County Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 76 (Bankr.D.N.H.1994) (postpetition submission of a draft plan of adjustment met § 109(c)(4)).

 Petitioners may satisfy the subjective requirement with direct and circumstantial evidence. They may prove their desire by attempting to resolve claims as in *County of Orange*; by submitting a draft plan of adjustment as in *Sullivan County*; or by other evidence customarily submitted to show intent. *See Slatkin,* 525 F.3d at 812. The evidence needs to show that the "purpose of the filing of the chapter 9 petition not simply be to buy time or evade creditors." *See Collier* ¶ 109.04[3][d], at 109–32.

Based on these parameters, we discern no clear error with the bankruptcy court's conclusion that Vallejo had the requisite desire to effect a plan. There is ample evidence in the record to support the subjective inquiry.

First, Vallejo submitted a Statement of Qualifications (the "Statement"), which stated "[Vallejo] desires to effect a plan to adjust its debts." The record shows that the city manager certified the Statement under oath. Moreover, Unions deposed the city manager and subpoenaed him for trial, but chose not to call him as a witness or cross examine him regarding the Statement.

The record also shows that Vallejo filed its petition not to buy time, but because it ran out of time. *Collier* ¶ 109.04[3][d], at 109–32. It negotiated with the Unions regarding the CBAs from December 2007 until days before its filing in May 2008. Its city staff first recommended that the city council file for bankruptcy in March 2008. Even so, Vallejo continued its negotiations with Unions. With a cash crunch approaching, the city council authorized Vallejo's filing on May 6, 2008, seventeen days before it actually filed for bankruptcy. Vallejo only filed its petition when its interim agreement with the Unions was about to expire, the mediation efforts with the Unions had failed and no other agreement could be reached. As of the petition date, the record shows that Vallejo had exhausted all other avenues.

Finally, Vallejo's postpetition efforts in implementing its Pendency Plan sufficiently demonstrate that its petition was designed to result in an eventual plan of adjustment of debts by which creditors' claims would be satisfied or discharged. We conclude that in light of this ample evidence, Vallejo met its burden of proving that it desired to effect a plan.

 The Unions also assert we should imply a good faith requirement into § 109(c)(4). We decline to do so for two reasons. First, § 921(c) already separately provides creditors with the ability to test filings for good faith. The Unions did not preserve that issue on appeal. Second, it "is generally presumed Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537,

114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). As shown by § 109(c)(5)(B), where Congress meant to add a further, specific good faith review, it did so. Since § 109(c)(4) does not similarly provide for "good faith," we conclude Congress did not inject another good faith review into § 109(c)(4).

## C. The Good Faith Creditor Negotiation Requirement Under § 109(c)(5)(B)

Section 109(c)(5)(B) requires that Vallejo demonstrate that it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that [Vallejo] intends to impair under a plan.…"

The Unions contend the bankruptcy court erred as a matter of law in finding that Vallejo's prepetition negotiations, which were directed at attempting to resolve its escalating labor costs outside of bankruptcy, met the statutory requirements under § 109(c)(5)(B). Relying on *In re Cottonwood Water and Sanitation Dist., Douglas County, Colo.*, 138 B.R. 973, 974 (Bankr.D.Colo.1992), and *Sullivan*, 165 B.R. at 78, they argue the statute requires that the negotiations concern the possible terms of a plan. Vallejo counters that the plain language of the statute does not require negotiations over plan terms. Here, Vallejo did not discuss or negotiate with the Unions or any other creditors over the possible terms of a plan of adjustment.

■■■■ The bankruptcy court's construction and interpretation of the statute is subject to de novo review. The starting point for our interpretation of a statute is its language. When a statute's language is plain, we enforce it according to its terms, unless such a reading would render it absurd. *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). Congress "says in a statute

what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). But to determine if the language is unambiguous we refer to "the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

■■■■ Section 109 (c)(5)(B)'s plain language does not explicitly state whether the negotiations with creditors must concern a proposed plan of adjustment. Nor do § 109(c)(5)(B)'s sister provisions, §§ 109(c)(1)-(4), clearly and unambiguously support a conclusion that the negotiations must concern a plan. *Cottonwood*, 138 B.R. at 975. Our plain language inquiry, however, is not limited to the single phrase "negotiated in good faith with creditors". Rather, we give it a meaning consistent with the remaining language in the statute. *See Marek v. Chesny*, 473 U.S. 1, 16 n. 5, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985)(Brennan, J., dissenting) ("[W]hile the starting point in interpreting statutes … is always the plain words themselves, '[t]he particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense they intended to be understood or what understanding they convey when used in the particular act.' ").

The full text of the statute provides us with a clue as to how we should determine what is required under the statute. The statute references adverse treatment ("impairment") to the interests of numerically important creditors ("majority … of each class") and specifically calls out creditors holding at least a majority in the amount of claims of each class that a petitioner intends to impair under a plan. The statute then adds that a petitioner satisfies this subsection if it is unable to obtain

agreement from those particular creditors after the negotiations. In the end, the negotiations referred to in the statute cannot be separated from its context, which clearly and unambiguously refers to the treatment of impaired creditors under a plan.

The significance the Code places on the lack of agreement with creditors identified by § 109(c)(5)(B) bolsters our interpretation that the negotiations must cover their treatment under a plan. The creditors identified by § 109(c)(5)(B) are those necessary to confirm a consensual plan of adjustment.[23] It is not by coincidence that Congress centered § 109(c)(5)(B) around the most critical creditors to confirming a plan, i.e., the majority of the impaired in every class.

 Finally, because § 109(c)(5)(B) involves classification and impairment, it would be difficult for a municipality to prove that it negotiated in good faith with creditors it intends to impair unless the municipality had a plan of adjustment drawn or at least outlined when it negotiated with the creditors. Thus, we conclude that the plain language of § 109(c)(5)(B) requires negotiations with creditors revolving around a proposed plan, at least in concept.

We do not mean to discourage or undermine prepetition negotiations with major creditors that are aimed at avoiding bankruptcy altogether with this result. Indeed, under these circumstances it has been observed that most chapter 9 bankruptcies occur because of failed negotiations, not a lack of them. Ryan Preston Dahl, *Collective Bargaining Agreements and Chapter*

*9 Bankruptcy*, 81 Am. Bankr.L.J. 295, 336 (2005).

We emphasize that while a complete plan is not required, some outline or term sheet of a plan which designates classes of creditors and their treatment is necessary. *See Sullivan County*, 165 B.R. at 78 (noting a formal plan is not required); *see also Cottonwood*, 138 B.R. at 979.

Accordingly, we conclude that the bankruptcy court erred in deciding that Vallejo satisfied § 109(c)(5)(B). While Vallejo unsuccessfully negotiated with Unions regarding the alteration of the CBAs, the evidence was undisputed that Vallejo never negotiated with Unions or any of its creditors over the possible terms of a plan of adjustment.[24] This error was harmless, however, because the alternative statutory requirement was met.

**D. The Alternative Creditor Negotiation Requirement: Impracticable Under § 109(c)(5)(C).**

 As an alternative to § 109(c)(5)(B), the bankruptcy court concluded Vallejo satisfied § 109(c)(5)(C). Section 109(c)(5)(C) provides that "[a]n entity may be a debtor under chapter 9 of this title if and only if such entity ... is unable to negotiate with creditors because such negotiation is impracticable." Whether the chapter 9 petitioner's negotiations with creditors is impracticable is reviewed for clear error. *In re Greene County Hosp.*, 59 B.R. 388, 391 (S.D.Miss. 1986).

The Unions argue that the court erred because it relied on Vallejo's List of Credi-

---

23. Section 901(a) incorporates certain provisions of §§ 1126 and 1129(a) into chapter 9, in particular, §§ 1126(c) and 1129(a)(8). Those provisions provide the backbone of consensual confirmation and determine when each class of claims accepts a plan.

24. We observe that the bankruptcy court did not use the words "class" or "impair" when it made its findings and conclusions on this issue.

tors Holding the 20 Largest Unsecured Claims and Calpers' Statement of Position to the Unions' Motion for Order Appointing Unions as Retiree Benefit Representatives. The Unions complain Vallejo never submitted the documents into evidence. The Unions add that neither Vallejo nor the court explained how the documents showed which creditors Vallejo sought to impair or how negotiations with the creditors listed in the documents were impracticable.

■■■■■ Whether negotiations with creditors is impracticable depends upon the circumstances of the case. " 'Impracticable' means 'not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.' In the legal context, 'impracticability' is defined as 'a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty.' " *Valley Health Sys.,* 383 B.R. at 163.

■■■■ Petitioners may demonstrate impracticability by the sheer number of their creditors or by their need to file a petition quickly to preserve their assets. *Id.* Petitioners may also show impracticability by their need to act quickly to protect the public from harm. Given the broad definition of impracticable, however, these examples are not exclusive. *Id.* (noting that the ordinary meaning of the word "impracticable" belies any notion that the reach of § 109(c)(5)(C) requires a debtor to either engage in good faith pre-petition negotiations with its creditors to an impasse or to

satisfy a numerosity requirement before determining that negotiation is impracticable).

■■■ The court found Vallejo could not meaningfully negotiate with Union Bank unless it could submit a viable long term financial plan based on adjustments to its labor costs. Even if Vallejo could identify its unknown creditors, including retirees, the court found it would have been fruitless to include them in the complex, ongoing negotiations with Unions.[25] Since the labor costs comprised the largest slice of Vallejo's budget, it would have been futile to negotiate with other creditors without an agreement with the Unions. Finally, Vallejo had to preserve its ability to continue providing the community uninterrupted services, and the court found a delay in filing to locate and negotiate with unknown creditors would have put those functions at risk.[26]

We conclude that the bankruptcy court's decision that Vallejo was unable to negotiate with creditors because such negotiation was impracticable is amply supported by the evidence in the record. No error occurred.

### E. The Banks Standing as Appellees

■■■ The Unions challenged the Banks' standing to participate in this appeal as appellees on the ground that they do not meet the "person aggrieved" test for bankruptcy appellate standing set forth in *Fondiller v. Robertson (In re Fondiller),* 707 F.2d 441, 443 (9th Cir.1983). Under the "person aggrieved" test, a party

---

**25.** Vallejo did not negotiate with its retirees, who hold claims of about $215 million. Vallejo never contacted the retirees because, as with unknown bondholders and potential tort claimants, it could not effectively identify them.

**26.** We do not need to address here whether it was appropriate for the bankruptcy court to take judicial notice of Calpers' Statement of Position or Vallejo's List of Creditors Holding 20 Largest Unsecured Claims. The bankruptcy court based its ruling on a number of other factual findings.

must demonstrate that they are directly and adversely pecuniarily affected by the order at issue. Such a demonstration may be made by showing the order diminished the party's property, increased its burdens or impaired its rights. *Id.* at 442.

The oft-cited rationale for this restrictive approach to bankruptcy appellate standing is the concern that if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad parties who are indirectly affected by every bankruptcy court order. *Id.* at 443. Accordingly, a common scenario for invoking the "person aggrieved" test is when "the appellant is a party other than the moving party." *Sherman v. Sec. and Exch. Comm'n (In re Sherman)*, 491 F.3d 948, 957 n. 8 (9th Cir.2006).

■ Whether a person is "aggrieved" for purposes of appellate standing is an issue of fact. *Paine v. Dickey (In re Paine)*, 250 B.R. 99, 104 (9th Cir. BAP 2000). While the Banks are undisputedly creditors, we cannot conclude that they qualify as "persons aggrieved" by the court's order for relief, which simply allows Vallejo's bankruptcy case to go forward. *See Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.)*, 177 F.3d 774, 778 (9th Cir.1999) (finding that creditor must have a direct pecuniary interest in a bankruptcy court's order before it has standing to appeal).

Courts have granted creditors standing to appeal orders that result in the transfer of assets of the estate or competing claims to a limited fund, reasoning that such orders directly and adversely pecuniarily affect them. *Id.* Here, there have been no determinations regarding the transfers of assets from this estate nor at this stage of the proceedings does this appeal involve competing claims to a limited fund. Accordingly, whatever claims the Banks may

have against Vallejo were not foreclosed or impaired by the court's entry of the order for relief in this case.

■ We conclude that the pecuniary interests of the Banks were not adversely affected by the entry of the order for relief, nor did they show that the order diminished the Banks' property, increased their burdens or impaired their rights. Thus they lack standing as appellees before us and we have not considered their briefs or their oral arguments. To hold otherwise opens the door for the possibility that all creditors have the right to participate in an appeal as appellees when the only question at issue is the debtor's eligibility to file its petition.

## VI. CONCLUSION

For the reasons set forth above, we AFFIRM.